AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia



FILED
JAN 17 2018
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

A Honda CRV with Virginia Plates WRB-1430 and VIN 5J6RM4H74DL071768

Case No. 1:18sw29

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
A Honda CRV with Virginia Plates WRB-1430 and VIN 5J6RM4H74DL071768, currently located at 46903 Sugarland Road, Sterling, VA.

located in the ____Eastern____ District of ____Virginia____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment A (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a)(4)(B) | Possession of Child Pornography |
| 18 U.S.C. § 2339B | Material Support to a Designated Foreign Terrorist Group |

The application is based on these facts:
See attached affidavit of Rachel Bergstrom, FBI Special Agent.

☐ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Rachel Bergstrom, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 17 Jan 18

City and state: Alexandria, Virginia

/s/
Ivan D. Davis
United States Magistrate Judge

## ATTACHMENT A - ITEMS TO BE SEIZED

Evidence, fruits, and instrumentalities of an attempt to provide material support to a designated foreign terrorist group, in violation of 18 U.S.C. § 2339B, and/or the possession of child pornography, violation of Title 18, United States Code, Sections 2252, including:

I. Any and all information, records, or internet activity with respect to:

    a. Attempts to communicate with or provide material support to a foreign terrorist group or any member or affiliate of a foreign terrorist group;

    b. Contact lists (including names, addresses, phone numbers, photographs, or any other identifying information) of individuals associated with foreign terrorist groups, and/or foreign or U.S.-based radicalizers or facilitators;

    c. Financial records that may indicate plans/preparation to travel overseas, or provide other material support to a foreign terrorist group;

    d. Child pornography and child erotica, as well as evidence of when such materials were uploaded, downloaded, modified, owned, controlled, accessed, deleted, shared, or otherwise used, and by whom;

    e. Programs, tools or applications that may be used for overt or clandestine/covert communications, and any associated contacts or communications history;

    f. Firearms, weapons, body armor, explosive devices, or their components;

    g. End-of-life documents, including but not limited to, life insurance policies, letters to family and/or associates, and/or a will.

II. Wireless telephones, computers, or electronic storage mediums, electronic data processing and storage devices, gaming systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs. The stored contents of any of the items described in this paragraph may be searched for any of the items listed in Section I of this Attachment, above.



IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF )<br>A 2013 HONDA CRV WITH VIRGNIA )<br>PLATES WRB-1430 and )<br>VIN 5J6RM4H74DL071768 ) | No. 1:18sw29 |

### AFFIDAVIT

I, Rachel Bergstrom, after being duly sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), assigned to the Washington Field Office, Joint Terrorism Task Force. I have been an FBI Special Agent since 2016. As part of my duties, I investigate terrorist activities associated with homegrown violent extremists. I have participated in numerous counterterrorism investigations, during the course of which I have conducted physical surveillance, executed court authorized search warrants, and used other investigative techniques to secure relevant information regarding various crimes.

2. This affidavit is submitted in support of a warrant to search a 2013 Honda CRV automobile, bearing Virginia license plates WRB-1430, and vehicle identification number ("VIN") 5J6RM4H74DL071768. Based on the facts contained in this affidavit, there is probable cause to believe this automobile contains evidence, fruits, instrumentalities, and/or contraband, more particularly described in Attachment A which is incorporated herein, related to an attempt to provide material support to a designated terrorist organization, in violation of 18 U.S.C. § 2339B, and/or the possession of child pornography, violation of 18 U.S.C. § 2252.

3. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other law enforcement and intelligence officials related to this investigation. The statements contained in this affidavit are based on my own observations, review of documents, recordings, and reliable information provided to me by other law enforcement officials. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. When in this affidavit I refer to something occurring on a specific date, I intend to convey that the event occurred on or about that date.

## Probable Cause

4. On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawhid wa'al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

I. <u>Duncan Possessed Evidence on Memory Chips and Thumb Drives</u>

5. In February 2016, the FBI received information regarding Sean Andrew Duncan, (hereinafter "Duncan"), a United States citizen, who moved to Sterling, Virginia in June 2017 from Pittsburgh, Pennsylvania. One of Duncan's relatives reported that Duncan had converted to Islam, may have been radicalized, and voiced his approval of westerners being beheaded in the Middle East. Duncan's relative reported that Duncan and his wife planned to travel to Turkey.

6. On December 6, 2017, the FBI conducted a search of Twitter and found an account associated with a specific phone number ending in 7730 ("the 7730 Phone Number"). According to an open source review of Twitter, the account was created in November 2015 and has the Twitter handle @DawlahtulIslaam. The phrase "Dawlahtul Isla[a]m" is an Arabic phrase that roughly translates to "The Islamic State." I believe that this Twitter account was controlled by Duncan, because in November 2015, Duncan listed the 7730 Phone Number in his application for a U.S. passport.

A. <u>Travel to Turkey</u>

7. According to U.S. Customs and Border Protection, Duncan and his wife booked a flight to Istanbul, Turkey, departing from Washington Dulles International Airport, on February 26, 2016. The reservations reflected that Duncan and his wife were scheduled to depart Turkey for Bangladesh on March 4, 2016, and return to the United States on March 20, 2016. In fact, on February 26, 2016, Duncan and his wife departed the United States for Turkey. On February 27, 2016, they were denied entry into Turkey, and returned to the United States. Upon their return, they were interviewed by the FBI.

8. According to telephone service provider records, on March 4, 2016, Duncan changed his cell phone number from the 7730 Phone Number to a number ending in 9440 ("the 9440 Phone Number").

### B. Duncan's Contact with a Foreign Detained Citizen

9. On July 25, 2017, during an interview with FBI agents, an unnamed co-conspirator (hereinafter "UCC"), who was in the custody of a foreign government for actively planning to travel to join ISIS, provided information regarding Duncan. According to UCC, Duncan was one of her U.S.-based contacts who had expressed an interest in joining ISIS, expressed an interest in conducting an attack in his homeland (the United States), and provided her instructions on how to construct homemade bombs. Duncan and UCC primarily spoke on encrypted mobile messaging applications. UCC also confirmed that she communicated with Duncan on a mobile messaging account ("MM1").

10. UCC told FBI Agents she first became acquainted with Duncan on social media in January 2015 when Duncan sent her a friend request. UCC and Duncan initially communicated through social media but subsequently exchanged phone numbers and communicated on encrypted mobile messaging applications.

11. According to UCC, Duncan shared news articles with her from an ISIS news outlet known as Amaq News. During their communications in early 2015, Duncan expressed agreement with ISIS spokesman Abu Mohammad Al-Adnani's statement that Muslims should be striking their own homelands. UCC recalled that when she asked Duncan directly if he supported ISIS, he replied that he did. In addition, UCC made it clear to Duncan from the start of their relationship in the beginning of 2015 that she would not communicate with him unless he was

"pro-ISIS." UCC was looking for a "Salafi or an ISIS supporter" to marry and live with in Syria. She believed she would reap "heavenly rewards" if she married an ISIS fighter who died in battle.

12. In February 2015, UCC asked Duncan if he intended to go to Syria. Duncan told UCC that he wanted to make "hijrah" to Syria and that he wanted UCC to go with him to Syria. In order for Duncan and UCC to go to Syria together, Duncan proposed marriage to UCC. Duncan's proposal occurred over an encrypted mobile messaging application. Duncan told UCC that after they were married, he wanted to plan their trip to Syria. Duncan wanted to come to UCC's country to propose to UCC in person, but she said it was too soon. As a result of UCC rejecting Duncan's offer of marriage, the two broke contact in or around March 2015.

13. UCC recalled a time before they broke contact when she was upset at work due to non-Muslim women wearing shorts that exposed their bodies. UCC told Duncan via an encrypted mobile messaging application she was upset with the way these women dressed and she wanted to do something about it. Duncan replied with a link to a website, and a message saying she could "try this." UCC stated that the link contained pictures and instructions on how to make weapons and bombs. UCC stated the link was to an article titled, "How to build a bomb in the kitchen of your Mom" from Inspire magazine.

14. In January 2016 (a month before Duncan and his wife's trip to Turkey), Duncan asked UCC if she still wanted to go to Syria and to be his second wife. UCC asked Duncan if his current wife would be okay with UCC coming with them to Syria. Duncan stated that his wife would have to be okay with it. UCC did not agree to go, and the two broke contact again.

15. In December 2016, Duncan, utilizing a mobile messaging account, re-initiated contact with UCC. Duncan told UCC that he had come back from Turkey, from where he and his wife had been sent back to the United States. Duncan said he thought the FBI was monitoring him, but would not elaborate on why he was deported or why the FBI was monitoring him. Duncan said he did not want to implicate himself and that his wife could keep secrets. Duncan stated that his wife knew what to say when questioned by authorities. In July 2017, the FBI reviewed the UCC's phones and confirmed there were communications between Duncan and UCC on encrypted mobile messaging applications.

### C. UCE #2's Interaction with Duncan

16. On August 2, 2017, the FBI identified a mobile messaging account ("MM2") with a naming convention similar to the one used by UCC to communicate with Duncan ("MM1"). A review of the profile photographs for this second mobile messaging account showed a photograph of Duncan and his father. In addition, the FBI found that MM2 was associated in the encrypted messaging application with the 9440 Phone Number.

17. On August 11, 2017, an FBI undercover employee (UCE #2) posing as UCC, contacted Duncan, who was using MM2. UCE #2 told Duncan that "she" had been arrested by foreign authorities. Immediately after being told this, Duncan created secure chats and self-destruct timers to destroy the content of his messages with UCE #2. UCE #2 told Duncan that "she" intended to make "hijrah." Duncan stated, "Hm, you know a fence Someone to take you, and is it safe in Iraq." Later, UCE #2 asked Duncan if he had a contact in Syria, to which Duncan responded, "No a couple have been marytred (sic)."

18. On August 20, 2017, UCE #2 told Duncan that "she" was in contact with an individual in Libya who was attempting to facilitate "her" travel to Libya. UCE #2 told Duncan that the Libyan contact was asking various vetting questions prior to assisting UCE #2. UCE #2 told Duncan that "her" Libyan contact was asking strange questions, such as UCE #2's blood type and family contact. UCE #2 then asked Duncan if he (Duncan) and his wife were asked similar questions when they tried to travel to Syria. Duncan stated, "they won't ask that." Duncan further stated, "I didnt (sic) go for that Just honeymoon."

19. However, later in the conversation, UCE #2 asked Duncan what to do about "her" contact in Libya. Duncan recommended that UCE #2 ". . . lie to him." Duncan stated he had never dealt with unnecessary vetting by "contacts" and that he had "always had referrals." Based on my training and experience, I know that ISIS uses a referral system to recruit new members, and I interpret Duncan's statement to mean that Duncan did not get asked questions by his contacts because he had "referrals" who could give them "tazkiyah." Tazkiyah is a recommendation from a Ji-hadi Shaykh from their homeland or a Mujahid already in the land of Ji-had. It is a generally given by an existing member of ISIS to show an individual is trustworthy.

D. Evidence from a Detained ISIS Supporter

20. In October 2017, a foreign government (not the one in whose custody UCC was) arrested one of its nationals ("Recruiter 1") for inciting rebellion. Recruiter 1 is an ISIS recruiter who is suspected of drawing foreign fighters from around the world to Recruiter 1's home country using social media. Recruiter 1 was married to two jihadis with connections to ISIS, one of whom is dead and the other of whom was arrested for extremism by his home country.

7

Recruiter 1 posted a message on an electronic messaging application soliciting local and foreign Muslims to help terrorists fight government troops in Recruiter 1's home country.

21. On December 4, 2017, during an interview with FBI agents, Recruiter 1 said she had begun recording the names and telephone numbers of individuals who had requested to join her Telegram, Facebook, or other social media and/or communication application groups. Recruiter 1's notes included a handwritten name appearing to be "Sean Ibn Gary Duncan," associated with the 7730 Phone Number and the associated username MM1.

E. Duncan's Phone History Research to Conduct Attacks

22. On June 29, 2017, the Allegheny County Police Department ("ACPD") provided a partial copy of Duncan's phone to the FBI. On October 6, 2017, ACPD provided the remainder of the copy to the FBI. ACPD had obtained this copy during an investigation surrounding the recent death of Duncan's infant child (the cause of death in the autopsy was inconclusive). Duncan consented in writing to ACPD's search of his phone. The FBI's review of Duncan's imaged phone revealed hundreds of internet searches between March 2017 and June 2017 for ISIS-related materials; weapons; terrorists; body armor; surveillance; defense tactics; watchlist statuses leaked, watchlist terms, watchlist explanations. Based on my training and experience I know the above-described searches are consistent with research into how to conduct an attack and defend oneself.

II. The Search of Duncan's Residence and Obstruction of Justice

23. On December 19, 2017, United States Magistrate Judge Theresa Carroll Buchanan authorized searches of Duncan's 2013 Honda CRV automobile, as well as his residence on

Courtyard Square, in Sterling, Virginia, for evidence of attempts to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, as well as false statements, in violation of 18 U.S.C. § 1001. Among the items authorized for seizure in the search were files or information (including files or information on computers or phones) involving travel or attempts to travel overseas; communications with members of foreign terrorist groups, and/or foreign or U.S.-based radicalizers or facilitators, or co-conspirators; contact lists of individuals associated with foreign terrorist groups, and/or foreign or U.S.-based radicalizers or facilitators; records of internet activity, or other information identifying support for or research related to a foreign terrorist group; and information, programs, tools or applications that may be used for overt or clandestine/covert communications, and any associated contacts or communications history.

24. On December 29, 2017, FBI agents executed the search warrants at Duncan's residence and automobile. Upon execution of the warrant at the residence, the agents knocked on the door, identified themselves as FBI, and announced that they were there to execute a search warrant. Receiving no response, the agents knocked and announced their presence again, but received no response again. The agents then forcibly opened the door, and again identified themselves as FBI, and that they were there to execute a search warrant. The agents at the front door did not see anyone.

25. Moments before the FBI agents entered the residence through the front door, Duncan ran out the back door, barefoot, and with something clenched in his fist. FBI agents guarding the back door yelled at Duncan to stop. Before stopping, Duncan threw a plastic baggie over the heads of the agents.

26. FBI agents recovered the baggie thrown by Duncan. The baggie was a clear plastic Ziploc bag, containing a memory chip stored within a thumb drive that had been snapped into pieces, and placed in a liquid substance that produced frothy white bubbles. The agents did not open the baggie to determine the nature of the liquid substance. Upon searching Duncan, agents recovered a broken casing for a thumb drive from Duncan's pants pocket.

27. Based on my training and experience, I know that thumb drives can be plugged into computers and used to store large gigabyte amounts of electronic information, to include images and documents. Based on my training and experience, I know that criminals often use thumb drives to store evidence of their criminal activity that they do not want found on their computers.

28. In light of the circumstances, I believe that Duncan fled from the house with the baggie and the memory chip and the broken thumb drive in order to conceal those items from the FBI agents that Duncan knew were about to search his house. Further, I believe that the thumb drive was snapped in pieces because Duncan altered, destroyed, and mutilated it in order to impede and obstruct the FBI's investigation of him for attempting to provide material support to terrorists. Similarly, based on the circumstances, I believe that the memory chip and broken thumb drive was contained in a baggy containing a liquid substance because Duncan altered, destroyed, and mutilated it in order to impede and obstruct the FBI's investigation of him.

III. <u>Child Pornography</u>

29. On December 29, 2017, and again on January 1, 2018, while reviewing one of the electronic devices obtained as a result of the search warrant referenced in the complaint for evidence pertaining to violations of Title 18, United States Code, Sections 1001 and 2339B, I observed images of what appeared to be child pornography contained within the device. Based

on my training, experience, and the facts set forth below, I believe that the images constitute violations of Title 18, United States Code, Sections 2252 and 2252A.

30. One item seized was a Samsung Galaxy Note 3 smartphone. On December 29, 2017, and again on January 1, 2018, I observed images of pre-pubescent minors that appeared to be engaged in sexually explicit conduct with adult males. The images appeared to be child pornography. I observed other images of pre-pubescent minors posed to expose their genitalia in a sexual manner, which also appeared to be child pornography. Several of the images appeared to be screen shots of viewed websites. The pre-pubescent minors in the photos were as young as infants, and the total number of images was in the hundreds.

31. The Samsung Galaxy Note 3 smartphone containing the images of suspected child pornography was, in the past, registered to the 7730 Phone Number that belonged to Duncan.

32. On January 4, 2018, United States Magistrate Judge Theresa Carroll Buchanan authorized searches of electronic devices and materials seized from Duncan's residence and automobile on December 29, 2017, for evidence of the possession of child pornography, in violation of 18 U.S.C. § 2252 and 2252A.

IV. <u>The First Search of the Vehicle</u>

33. Pursuant to the search warrant issued on December 19, 2017, the search of Duncan's 2013 Honda CRV that was conducted on December 29, 2017, followed typical FBI procedures for searching a vehicle. As a result, the search included all areas of the vehicle that were accessible to the investigators. In the course of the search, however, investigators did not remove attached portions of the vehicle's interior or exterior.

34. Among the items seized in connection with the search warrants executed on December 29, 2017, was Duncan's iPhone. On or about January 7, 2018, a forensic examiner searched the contents of the iPhone in accordance with the warrants. That examiner found that Duncan conducted numerous internet searches regarding how to remove the floor and door panels for a 2013 Honda CRV. The FBI investigators who searched Duncan's vehicle on December 29, 2017, did not remove its floor or door panels to see if anything was hidden beneath or behind those panels.

35. Based on my training and experience, I know that individuals engaged in illegal activity take steps to conceal evidence of their criminal behavior. Further, I know that evidence secreted within the interior panels of a vehicle would likely not be discovered during the typical execution of a search warrant. In light of the evidence in this case, Duncan's searches related to removing the interior panels of the car that he owns constitutes probable cause to believe there is evidence secreted within his car that the FBI did not find in connection with the search conducted on December 29, 2017.

36. On January 13, 2017, FBI observed Duncan's vehicle at 46903 Sugarland Road, Sterling, VA.

37. Based on the information set forth above, I submit there is probable cause to believe Duncan's 2013 Honda CRV, bearing Virginia license plates WRB-1430, and vehicle identification number ("VIN") 5J6RM4H74DL071768, contains evidence, fruits, instrumentalities, and/or contraband related to an attempt to provide material support to a designated terrorist organization, in violation of 18 U.S.C. § 2339B, and/or the possession of

child pornography, violation of Title 18, United States Code, Section 2252.

Wherefore, I request the issuance of a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYS NOT.

Rachel Bergstrom
Special Agent, FBI

Subscribed to and sworn before me on this 17th day of January 2018.

/s/
Ivan D. Davis
United States Magistrate Judge

13

## ATTACHMENT A - ITEMS TO BE SEIZED

Evidence, fruits, and instrumentalities of an attempt to provide material support to a designated foreign terrorist group, in violation of 18 U.S.C. § 2339B, and/or the possession of child pornography, violation of Title 18, United States Code, Sections 2252, including:

I. Any and all information, records, or internet activity with respect to:

    a. Attempts to communicate with or provide material support to a foreign terrorist group or any member or affiliate of a foreign terrorist group;

    b. Contact lists (including names, addresses, phone numbers, photographs, or any other identifying information) of individuals associated with foreign terrorist groups, and/or foreign or U.S.-based radicalizers or facilitators;

    c. Financial records that may indicate plans/preparation to travel overseas, or provide other material support to a foreign terrorist group;

    d. Child pornography and child erotica, as well as evidence of when such materials were uploaded, downloaded, modified, owned, controlled, accessed, deleted, shared, or otherwise used, and by whom;

    e. Programs, tools or applications that may be used for overt or clandestine/covert communications, and any associated contacts or communications history;

    f. Firearms, weapons, body armor, explosive devices, or their components;

    g. End-of-life documents, including but not limited to, life insurance policies, letters to family and/or associates, and/or a will.

II. Wireless telephones, computers, or electronic storage mediums, electronic data processing and storage devices, gaming systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs. The stored contents of any of the items described in this paragraph may be searched for any of the items listed in Section I of this Attachment, above.